UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SCOTT WEINERTH,

                    Plaintiff,

vs.                                Case No.  2:10-cv-170-FtM-29SPC

HARVEY AYERS, City of Punta Gorda,
Florida, Police Officer, in his
individual capacity,

                    Defendant.
_____

## OPINION AND ORDER

    This matter comes before the Court on Detective Harvey Ayers'
Dispositive Motion for Summary Judgment (Doc. #46) filed on
November 3, 2011.  Plaintiff filed a Response in Opposition (Doc.
#54) on December 1, 2011.

    The operative pleading in this case is a four count Second
Amended Complaint (Doc. #20) filed by plaintiff Scott Weinerth
(plaintiff or Weinerth) against Harvey Ayers (Ayers or defendant),
a police officer and employee of the City of Punta Gorda, Florida.
Count I alleges a 42 U.S.C. § 1983 claim for violation of the
Fourth Amendment based upon false arrest, while Count II alleges a
companion state law claim of false arrest.  Count III alleges a §
1983 claim for violation of the Fourth Amendment based upon
malicious prosecution, while Count IV alleges a companion state law
claim for malicious prosecution.  Defendant asserts that no cause
of action has been established because there was probable cause to

arrest plaintiff, and that he is entitled to qualified immunity as to the § 1983 claims because there was at least arguable probable cause to arrest plaintiff.   Plaintiff disagrees with both contentions.  For the reasons set forth below, the Court finds that Detective Ayers had probable cause to arrest plaintiff Weinerth, and therefore summary judgment will be granted in favor of defendant on all counts.[1]

## I.

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010).  A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party.  Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).

---

[1]The Court's resolution of the probable cause issue makes it unnecessary to address the other issues raised by defendant.

## II.

Probable cause is central to the positions of each side in this case.  Plaintiff asserts that Detective Ayers had no probable cause to arrest him, and that the Affidavit he submitted to the state court judge did not establish probable cause when construed without its misrepresentations and omissions.  The legal principles for all four counts are well established.

**A.  Count I:  Arrest Without Probable Cause/False Affidavit**

Count I sets forth a claim under 42 U.S.C. § 1983 alleging that Detective Ayers violated plaintiff's Fourth Amendment rights by arresting him without probable cause.  Count I also asserts that the arrest was based upon an arrest warrant affidavit which contained material misrepresentations and omissions, and which would not establish probable cause if the misrepresentations are removed and the omissions are included.  (Doc. #20, ¶59.)

The Fourth Amendment, which is applicable to the States through the Fourteenth Amendment, guarantees the right against unreasonable searches and seizures. U.S. Const. amend. IV.  An arrest qualifies as a "seizure" of a person under the Fourth Amendment.  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011); California v. Hodari D., 499 U.S. 621, 624 (1991).  The reasonableness of an arrest is "turns on the presence or absence of probable cause" for the arrest.  Case v. Eslinger, 555 F.3d 1317, 1326-27 (11th Cir. 2009)(citing Skop v. City of Atlanta, Ga., 485

F.3d 1130, 1137 (11th Cir. 2007)).   An arrest without probable cause violates the Fourth Amendment, Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997), and a cause of action for damages may be asserted under § 1983, Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 n.15 (11th Cir. 2010).   Plaintiff has the burden of establishing the absence of probable cause to succeed on a § 1983 claim.   Rankin v. Evans, 133 F.3d 1425, 1436 (11th Cir. 1998).   To do so, plaintiff must show that no reasonably objective police officer would have perceived there to be probable cause for the arrest.   Phillips v. Fla. Fish & Wildlife Conservation Comm'n, 325 F. App'x 864, 865 (11th Cir. 2009).

An officer must conduct a constitutionally sufficient investigation before making an arrest.   Kingsland v. City of Miami, 382 F.3d 1220, 1228-30 (11th Cir. 2004); Rankin, 133 F.3d at 1435-36.   While officers may not ignore known exculpatory information in deciding whether to arrest, they need not explore every proffered claim of innocence or take every conceivable step to eliminate the possibility of convicting an innocent person.   Kingsland, 382 F.3d at 1229; Rankin, 133 F.3d at 1435.   An officer may normally rely on a victim's criminal complaint to support probable cause.   Rankin, 133 F.3d at 1441; Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with a crime, has probable cause to

effect an arrest absent circumstances that raise doubts as to the victim's veracity."). In deciding whether probable cause exists, an officer is "not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed. Nor does probable cause require certainty on the part of the police." Dahl v. Holley, 312 F.3d 1228, 1234 (11th Cir. 2002)(citations omitted). Additionally, "a police officer need not credit everything a suspect tells him", Rodriguez v. Farrell, 294 F.3d 1276, 1278 (11th Cir. 2002), and "is not required . . . to resolve all inferences and all factual conflicts in favor of the suspect." Bailey v. Bd. of County Comm'rs, Alachua Cnty., Fla, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992).

An officer who has probable cause to arrest may constitutionally arrest a suspect without civil liability. "[T]he existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." Brown, 608 F.3d at 734. "An arrest does not violate the Fourth Amendment if a police officer has probable cause for the arrest." Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003). See also Jordan v. Mosley, 487 F.3d 1350, 1355 (11th Cir. 2007). An officer has probable cause to arrest when the arrest is objectively reasonable based on the totality of the circumstances. Coffin v.

Brandau, 642 F.3d 999, 1006 (11th Cir. 2011).  "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Coffin, 642 F.3d at 1006-07.

Probable cause need only exist for some criminal offense; it does not matter that an officer believed he was arresting a suspect for a different offense.  Knight v. Jacobson, 300 F.3d 1272, 1275 n.2 (11th Cir. 2002); Lee v. Ferraro, 284 F.3d 1188, 1196 (11th Cir. 2002) ("[W]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." (citation omitted)).  Additionally, the fact that the arrestee was never prosecuted, or the charges were dropped, or he was acquitted of any offense stemming from the arrest, does not impact the existence of probable cause.  Jacobson, 300 F.3d at 1275; Ferraro, 284 F.3d at 1195-96; Marx v. Gumbinner, 905 F.32d 1503, 1507 (11th Cir. 1990); Howell v. Tanner, 650 F.2d 610, 615 (5th Cir. Unit B July 1981)("Once probable cause has been established, the legality of the arrest is not affected by ... a subsequent dismissal or acquittal of the charges.").

The Fourth Amendment also prohibits a police officer from knowingly or recklessly making false statements in an affidavit in support of an arrest warrant. Kelly v. Curtis, 21 F.3d 1544 (11th Cir. 1994). "The Warrant Clause of the Fourth Amendment requires that warrant applications contain sufficient information to establish probable cause." Holmes v. Kucynda, 321 F.3d 1069, 1083 (11th Cir. 2003)(citing Franks v. Delaware, 438 U.S. 154, 164 (1978)). The "obvious assumption is that there will be a truthful showing" to establish probable cause. Franks, 438 U.S. at 164-65. While this requirement of truthfulness "does not dictate that the statements be objectively accurate, it does require that they "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." Holmes, 321 F.3d at 1083 (quoting Franks, 438 U.S. at 165). A police officer may be held liable under 42 U.S.C. § 1983 for submitting an application for an arrest warrant that contains false information in this sense. Holmes, 321 F.3d 1083; Malley v. Briggs, 475 U.S. 335, 346 (1986). Because an arrest warrant is presumptively valid, Franks, 438 U.S. at 171, plaintiff must establish that probable cause would have been lacking absent the alleged misrepresentations or omissions, United States v. Gamory, 635 F.3d 480, 490 (11th Cir. 2011). A judge's decision to issue the arrest warrant in such a situation does not absolve the police officer from liability.

Garmon v. Lumpkin County, Ga., 878 F.2d 1406, 1409-10 (11th Cir. 1989)(citing Malley, 475 U.S. at 344).

If a constitutional violation has occurred because an officer lacked probable cause, the Court next considers whether arguable probable cause existed for the § 1983 claims. Case, 555 F.3d at 1327. An officer who makes an arrest without actual probable cause is nonetheless entitled to qualified immunity in a § 1983 action if there was "arguable probable cause" for the arrest. Brown, 608 F.3d at 734; Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)(officials are entitled to immunity for an unlawful arrest claim so long as there was probable cause or arguable probable cause for the arrest); Coffin, 642 F.3d at 1006 (same). Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." Kingsland, 382 F.3d at 1232 (quotation marks omitted); Brown, 608 F. 3d at 734. The arguable probable cause standard is an objective standard which does not consider an officer's subjective intent or beliefs. Brown, 608 F.3d at 735, 736. Showing probable cause or arguable probable cause does not, however, require proving every element of a crime. Jordan, 487 F.3d at 1355 ("No officer has a duty to prove every element of a crime before making an arrest."); Brown, 608 F.3d at 735; Scarbrough v. Myles, 245 F.3d 1299, 1302-03 (11th Cir. 2001). If

the arresting officer had arguable probable cause to arrest for <u>any</u> offense, qualified immunity will apply.  <u>Skop</u>, 485 F.3d at 1138; <u>Grider v. City of Auburn, Ala.</u>, 618 F.3d 1240 (11th Cir. 2010).

If a constitutional violation has occurred because of false statements or omissions in an arrest warrant affidavit, the Court examines the officer's eligibility for qualified immunity.  If a reasonable police officer would have known that information in the affidavit was not just negligently false, but recklessly so, then officer is not entitled to qualified immunity.  <u>Kelly</u>, 21 F.3d at 1554; <u>Holmes</u>, 321 F.3d at 1083.  Qualified immunity will not shield an officer from liability for intentional false statements in an arrest affidavit if such false statements were necessary to the probable cause.  <u>Jones v. Cannon</u>, 174 F.3d 1271, 1286 (11th Cir. 1999).

**B.  Count II:  State Claim of False Arrest**

Count II alleges a state law claim for false arrest based upon the same factual predicate as Count I.  (Doc. #20, ¶64).  "False arrest is defined as the unlawful restraint of a person against that person's will."  <u>Willingham v. City of Orlando</u>, 929 So. 2d 43, 48 (Fla. 5th DCA 2006)(citation omitted).  Such a restraint is unlawful if there is no probable cause, but the existence of probable cause bars an action for false arrest under Florida law. <u>Rankin</u>, 133 F.3d at 1435; <u>Mathis v. Coats</u>, 24 So. 3d 1284, 1289 (Fla. 2d DCA 2010)(citation omitted).  "In a false arrest action,

probable cause is an affirmative defense to be proven by the defendant." Willingham, 929 So. 2d at 48 (citations omitted). The standard for determining the existence of probable cause is the same under both Florida and federal law. Rankin, 133 F.3d at 1431; Coffin, 642 F.3d at 1106-07. Even if an arrest for the charged offense cannot be sustained, an arrest is nonetheless lawful if it was based on a probable cause showing that defendant committed a different offense. "An arrest based on probable cause is not rendered unlawful because the arresting officer attaches an improper label to it." Blanding v. State, 446 So. 2d 1135, 1136 (Fla. 3d DCA 1984).

## C.  Count III:  Malicious Prosecution Under Fourth Amendment

Count III sets forth a claim under 42 U.S.C. § 1983 alleging that Ayers violated plaintiff's Fourth Amendment right to be free of malicious prosecution by arresting him without probable. Count III repeats the allegation that the arrest was based upon an arrest warrant which contained material misrepresentations and omissions and which would not establish probable cause if the misrepresentations are removed and the omissions are included. (Doc. #20, ¶70.)

The Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." Wood, 323 F.3d at 881; Kjellsen v. Mills, 517 F.3d 1232, 1237 (11th Cir. 2008). "[A]lthough both state

law and federal law help inform the elements of the common law tort of malicious prosecution, a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law." Wood, 323 F.3d at 882. "To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures." Kingsland, 382 F.3d at 1234 (citing Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003)). The elements of the common law tort of malicious prosecution are: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." Wood, 323 F.3d at 882. As to the second prong, an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment. Brown, 608 F.3d at 734; Wood, 323 F.3d at 882. The existence of probable cause defeats a § 1983 malicious prosecution claim. Kjellsen, 517 F.3d at 1237; Wood, 323 F.3d at 882. Additionally, the same "arguable probable cause" standard is used to determine qualified immunity for both false arrest and malicious prosecution § 1983 claims. Grider v. City of Auburn, Ala., 618 F.3d 1240, 1257 (11th Cir. 2010).

**D.   Count IV:   State Claim of Malicious Prosecution**

Count IV sets forth a claim under Florida law for malicious prosecution (Doc. #20, ¶¶76-80).  The elements of this Florida tort are:

> (1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding.

Fernander v. Bonis, 947 So. 2d 584, 589 (Fla. 4th DCA 2007)(citation omitted).  The failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution.  Thus, to establish a claim for malicious prosecution under Florida law, plaintiff must establish facts that established "there was an absence of probable cause for the original criminal proceeding."  Kingsland, 382 F.3d at 1234.  The presence of probable cause defeats a malicious prosecution claim.  Fernander, 947 So. 2d at 589.

### III.

The presence or absence of probable cause is the linchpin of defendant's motion for summary judgment as to all counts.  If the undisputed material facts establish probable cause to arrest plaintiff existed, all four counts fail.  Even if only arguable

probable cause to arrest existed, the § 1983 claims fail.   The record reflects the following material undisputed facts:

## A.   Overview of Investigation

On November 6, 2005, while on-duty as a Detective with the Criminal Investigation Division of the City of Punta Gorda Police Department, Detective Ayers met with an officer and the victim of an alleged sexual battery (the Victim) at Fawcett Memorial Hospital in Port Charlotte, Florida.   Detective Ayers took over the investigation, and interviewed the Victim in the hospital.   The Victim informed Detective Ayers that she was sexually assaulted against her will by a co-worker on Thursday, November 3, 2005, and identified the assailant as plaintiff Weinerth.   The Victim informed Ayers that she was an operating room nurse at Charlotte Regional Medical Center and worked with Weinerth.   An Offense Report was created contemporaneously, containing Ayers' observations and conclusions.   (Doc. #46-1, Exh. 1, ¶ 6.)

On November 7, 2005, Detective Ayers arranged for a controlled telephone call between the Victim and Weinerth.   (Doc. #46-2, Exh. 5-b.)   On November 8, 2005, Weinerth provided a Voluntary Witness Statement (Doc. #46-6, Exh. E)[2] to Detective Ayers at the Punta Gorda Police Department.

---

[2]The page numbers referenced will be those provided through CM/ECF rather than the transcript page numbers at the bottom of each page.

On November 15, 2005, Joanne Thompson, Director of Surgical Services and the Assistant Chief Nursing Officer at Charlotte Regional Medical Center, provided a Voluntary Witness Statement. She stated that phenothiazine, which was found in Victim's system, is commonly found in Compazine or Phenergrin, which are for nausea and vomiting, and that the medications were easily accessible to both Weinerth and Victim.  (Doc. #46-2, Exh. 6.)  Parts of Ms. Thompson's conversation with Ayers were not recorded.  (Doc. #54-9, p. 48.)

On November 17, 2005, Detective Ayers took a Voluntary Witness Statement (Doc. #46-7, Exh. F) from Tara Ann McGinn, who had been dating Weinerth for a month.  Ms. McGinn was with Weinerth over that weekend.  She arrived Friday evening and used the key under Weinerth's mat to get into his condo and wait for him.  They woke up at 3:30 Saturday morning and left an hour later to drive to Fort Lauderdale.  Ms. McGinn dropped off Weinerth at an office for hair implant surgery and picked him up in his car at the end of the day. (Id., pp. 4-5.)  Ms. McGinn returned to Sarasota on Sunday to check her townhouse and drove back Sunday night to stay in Weinerth's condo again before leaving Monday morning.  (Id., p. 5.)  Weinerth had mentioned 2-3 weeks before that he would be leaving town to get his personal property from New Orleans but returning.  (Id., p. 6.) Ms. McGinn stated that she had seen a soft-sided briefcase or laptop bag, but a little larger.  (Id., p. 8.)

-14-

**B.  Controlled Call**

During the controlled call, only the Victim's side of the conversation was recorded as follows:

> VICTIM:   Um, nothing.  I just got out of work.  What are you doing?
> You what?  Oh.
> What's going on?  What's going on?
> You what?  You got your truck?  That's good.  Do you like it?
> How come you don't work today?  Um, are you sick?
> Yeah.  Huh.
> That's funny you mention that.  I have  had stomach pains ever since Friday.  I haven't felt right.
> But, you know, I did want to talk to you about the other night.  I really freaked out about, like, the whole -- do you know what I mean; having unprotected sex.  You know, you pushed me further than I wanted to go.  Do you know what I'm saying?
> All right.  And I'm freaking out about it.
> Well, I mean, I worry about, you know, the hepatitis or HIV thing.  And it really -- it just hurt my trust that you did that to me.  I mean, it just -- I -- it sounds weird, but I've been crying all weekend.  I just feel like you really -- you just hurt my trust.  You know what I'm saying?
> I mean I care about you, but I feel like you didn't respect me when you didn't listen to me when I said no.
> Did you hear me say no?
> Hello?
> Yeah.  Hello.  I can hear you.
> Okay.  Did you understand -- did you hear me that I said no and was fighting you?
> He hung up the phone.
>
> DETECTIVE AYERS:  Okay.
>
> VICTIM:  That's weird that he -- he's on his cell phone, and I can hear wind.
>
> DETECTIVE AYERS:  He's probably driving.
>
> VICTIM:  Do you think he knows?  I mean I'm all paranoid now.  God, did he follow me?
>
> DETECTIVE AYERS:  No.  Call him back again.

VICTIM:  How weird is it that he hasn't called me, and all of a sudden he calls me.

DETECTIVE AYERS:  Leave a message.

VICTIM:  Hi.  It's me.  You need to call me back; okay? Bye.

(Doc. #46-2, Exh. 5-b.)  The recording device malfunctioned, but Ayers was sitting next to the Victim and was able to hear the entire conversation from both parties.  (Doc. #46-1, Exh. 1.)

## C.  Weinerth's Voluntary Statement

Weinerth stated he had known the Victim for a few months, "kinda flirting around at work", kissing and groping in a storage area a couple of times.  (Doc. #46-6, Exh. E, pp. 13-14.)  Weinerth stated that Victim waited around for him that Thursday night for him after she was off, which was "not cool from the workplace", so Weinerth went to his car and called Victim from there to tell her he was going to Fishermen's Village.  (Id., p. 15.)  Weinerth and Victim met at the bar, still in scrubs, had drinks, and then went to the restaurant on the upper deck to eat dinner.  (Id., pp. 16-17.)  Victim had two beers downstairs and they shared a whole bottle of red wine at dinner.  (Id., p. 19.)  After dinner, Victim followed Weinerth back to his condo where they sat on the couch and started kissing and fooling around.  (Id., pp. 17-18, 20.)  They had maybe a sip of wine before they started kissing.  (Id., p. 24.)  Weinerth asked Victim if she wanted to go in the bedroom and lay down, and they both "hopped up, walked in there."  (Id., pp. 20,

23.)  In the bedroom, Victim pulled off her own shirt and jacket, and bra, and Weinerth thought she took off her own panties.  (<u>Id.</u>, pp. 20-21.)  Weinerth had sexual intercourse, penis to vagina, and oral sex.  Victim did not seem like she had been drinking, and her speech and balance were fine.  (<u>Id.</u>, pp. 22, 80.)  Victim left around 12:00 or 12:30 to go let the dog out, Weinerth kissed her as she left.  (<u>Id.</u>, p. 25.)  They talked briefly that night, as they both had work the next day, and Victim said the dog was good.  (<u>Id.</u>, p. 26.)  The next day, they worked in separate rooms, but Weinerth walked by and grabbed Victim's hand and she turned and smiled, like everything was fine.  (<u>Id.</u>, p. 28.)  Weinerth stated that he did not take drugs and did not give her drugs.  (<u>Id.</u>, p. 29.)  Weinerth had a bag with him during the interview, which he said contained a box of drugs for anesthesia and a nerve stimulator.  Weinerth said the bag normally never leaves the hospital, except this time he was with the police and thought it was fine.  (<u>Id.</u>, pp. 31-33.)  Weinerth signs in for the box and signs out before leaving the box at the end of the day.  (<u>Id.</u>, pp. 34-35.)  Weinerth stated that he did not give Victim anything, not even to relax her; the drug kit was not even at the house, and Victim never said no.  (<u>Id.</u>, pp. 49-50.)  Weinerth did not call her on the weekend as he was with someone else.  (<u>Id.</u>, p. 56.)  During the controlled call Weinerth said he was trying to placate Victim and didn't want to get into a confrontation, didn't want things to get bad at work.  (<u>Id.</u>, pp. 69-70, 74.)

**D.  Ayers' Affidavit**

On or about November 17, 2005, Detective Ayers prepared a sworn Affidavit in support of arrest for submission to a state court judge.  (Doc. #54-1, Exh. A.)  The Affidavit stated the following:

> On Sunday, November 6, 2005, Ayers responded to Fawcett Memorial Hospital, located at 21298 Olean Blvd, Port Charlotte, Charlotte County, Florida, in reference to an alleged sexual battery.  Detective Ayers made contact with the victim [ ] who reported that on the 3rd day of November, she was Sexually Battered, in the area of West Marion Ave, within the City Limits of Punta Gorda.
>
> Detective Ayers obtained a sworn statement from the victim, [ ] to the following information.  The victim stated that she works at Charlotte Regional Medical Center as a Registered Nurse in the Operating Room.  The victim stated that she works with the suspect Scott Weinerth, who is a Nurse Anethnasist [sic], who also works in the operating room.  The victim stated that she and S. Weinerth have been flirting with each other for the last several weeks, and on Thursday 11-03-05 S. Weinerth asked the victim to have dinner and drinks after work.  The victim stated that she agreed and the two met at Harpoon Harry's.  The victim stated that the two had several drinks in the bar and then proceeded to the Captain's Table, which is upstairs and had dinner and more wine.  S. Weinerth ordered a bottle of wine to go, then asked the  victim to come back to his residence, which was just down the road, stating that he did not want her to drive, after consuming alcohol.  The Victim agreed to go back to S. Weinerth's home, but stated that she did not feel intoxicated, but did have a slight "buzz."
>
> The two proceeded to S. Weinerth's home, which is located at 220 Coldway Drive, Building #1, Unit #114, which is located within the City Limits of Punta Gorda.  The victim stated that she entered the residence and sat on the couch, watching television.  S. Weinerth went to the kitchen and prepared a glass of wine for the victim, at which time he was out of sight of the victim.  S. Weinerth came from the kitchen with two glasses of red

wine, and the two sat on the couch watching television. The Victim stated that she consumed about half the glass of wine, and began to feel "woozy", and out of it.  The victim stated she recalled kissing S. Weinerth and him attempting to pull her pants off.  The victim stated that [sic] the following facts, but the events seemed "hazy", and there are moments of black outs in her memory.  The victim recalls finding her pants off, and S. Weinerth pulling at her underwear, in attempts to get them off. The victim stated that she held onto her underwear, and was telling S. Weinerth "no", and to stop, while still seated on the couch.

The Victim next found herself in the bedroom, with her clothes off, and on the bed.  S. Weinerth was on top of her, and had penetrated her vagina with his penis.  The victim stated that she recalled telling S. Weinerth to stop, but he refused.  The suspect also made the statement, "suck my cock", and forced his penis into her mouth.  The victim stated that she recalled being placed on her back and stomach, and that S. Weinerth penetrated her vagina with his penis, in both positions.  The victim advised that she must have passed out and awoke around 2:00 am, in the bed with S. Weinerth and she was naked. S. Weinerth stated that she attempted to get dressed and leave, having problems standing and finding her things. Once she found her items she attempted to leave, at which time S. Weinerth requested she stay and when that did not work, he told her not to tell anyone of the incident. The victim stated that the entire event felt like a movie, which she was watching, that came in and out.  The victim stated that she had never felt this way before and believed S. Weinerth had drugged her without her permission or consent, then had sexual intercourse with her while she was incapacitated.

Doctor Myers, who was the attending Emergency Room Physician conducted an exam, and took a blood sample from the victim for a comprehensive drug screen.  The drug screen revealed the victim had Phenothiazines in her system.  Phenothiazines are the largest of the five main classes of antipsychotic drugs.  This drug causes Parkinsonism and sedation.  The victim has suffered from shaking and tremors, which is related to Parkinsonism, since the incident.  The victim provided information from her private doctor, which reported that she is not taking any medications which contain Phenothiazines, as they would cause her problems with the blood pressure

medication she is prescribed.  The victim advised that she wished to press charges against S. Weinerth.

The victim conducted a controlled phone call to S. Weinerth, in the presence of Detective Ayers, in which he was confronted about forcing the victim to have sex and her saying no.  S. Weinerth acknowledged that the victim said "no", and that the incident was forced. S. Weinerth was asked did you hear me say, "No" about having sex, and he stated "yeah I Know."

Detective Ayers contacted S. Weinerth at Charlotte Regional Medical Center. S. Weinerth agreed to go to the Police Department to discuss this incident. S. Weinerth had a small bag in his possession.  Detective Ayers received consent to search the bag, which contained a plastic box with numerous narcotics, which belonged to the Hospital.  This container contained narcotics used for sedation, and is suppose to be returned to the hospital at the end of each shift.  The bag also contained approximately twelve unmarked syringes, which S. Weinerth stated contained muscle relaxers, and blood pressure medications.  The medication within the syringes is not accounted for, and does not have to be returned. This bag also contained a nerve stimulator, which is used to check a patient to determine if they are sedated.  The bag contained personal items belonging to S. Weinerth and is his personal bag.  S. Weinerth provided a statement, in which he admitted that the hospital does not keep a close watch on the medications he has in his possession, and his distribution and disposal is based on the hospitals trust in him.  S. Weinerth does keep the bag in question in his possession at all times, and does take it home with him.

S. Weinerth provided a post Miranda video taped statement.  S. Weinerth admitted to having sexual intercourse with the victim, but denied forcing the victim or her saying no or stop.  S. Weinerth denied giving the victim any controlled substances.  Detective Ayers confronted S. Weinerth about the the controlled phone call, which he admitted to his statements to the victim about forcing her, and having sex with her against her will, but stated that he only told her this to keep her calm and go along with her.  S. Weinerth was also found to make several statements, which were found to be of a false nature.

Detective Ayers obtained a sworn statement from Joanne Thompson, who is the Nursing Director for the Surgery Department of Charlotte Regional Medical Center.  J. Thompson advised that S. Weinerth has access to Compazine, which is used for antiemetic, antipsychotic, or a tranquilizer, and contains Phenothiazine.  This is the controlled substance, which was found in the victims system.  J. Thompson advised that this medication comes in several forms, one of which is liquid, and could be mixed with a drink, such as wine.  J. Thompson also advised that S. Weinerth was very flirtatious with women employees, and had to be told by J. Thompson not to be so hands on with women employees.  J. Thompson confirmed that these medications are not strictly kept, and it would be easy for S. Weinerth to take some for personal use.

On November 15, 2005 Detective Ayers learned that S. Weinerth had fled the area breaking his contract with the Hospital.  S. Weinerth failed to show for work and has since been fired for falsifying work documents.  S. Weinerth was made aware of when the drug screen would be received and he apparently fled the area just prior to the results being received.  The whereabouts of S. Weinerth are unknown.

S. Weinerth was found to have access and use the narcotic, which was found in the victims system.  S. Weinerth also had the opportunity and means to administer the narcotic to the victim without her knowledge.  S. Weinerth also acknowledged the victim saying "no", and her being forced to have sex, when confronted on the controlled phone call.

Detective Ayers is requesting that a warrant be issued for the arrest of Scott J. Weinerth on the charge of Sexual Battery, contrary to the statute in such case made and provided, and against the peace and dignity of the State of Florida.

(Doc. #54-1, Exh. A.)

Upon completion of an Arrest Warrant Affidavit, it was submitted to defendant's supervisor for review, and then to a Assistant State Attorney for review before it was presented to the judge.  (Doc. #20, ¶ 7.)  On November 17, 2005, a Charlotte County

judge issued a warrant for Weinerth's arrest for sexual battery in violation of Florida Statute Section 794.011(4)(d), a first degree felony carrying a penalty of up to 30 years in prison. (Doc. #20, ¶ 6; Doc. #46-2, Exh. 4.)

## E. Post-Arrest

On November 22, 2005, Weinerth was arrested and bond was set at $200,000.00. (Doc. #20, ¶ 55.) Charges were eventually *nolle prossed* by the State of Florida. (Id., ¶¶ 71, 78.)

After the arrest, at her March 8, 2006, Deposition, Ms. Thompson stated that Weinerth was hired under a contract between the administration and Rhino Medical for a few months. (Doc. #54-9, pp. 6, 7-8.) The November 2005 "incident" occurred just prior to the scheduled end of his month to month contract. (Id., p. 7.) Ms. Thompson stated that there was only one narcotic box in the holding area of the operating room with only one set of keys held by the registered nurse assigned to the holding area. (Id., pp. 11, 12.) Victim did not generally work in the holding area. (Id., p. 12.) In the common area of the operating room is a Accudose, a medication dispensing program or system, accessible by the registered nurses but not Weinerth. (Id., pp. 14, 15, 16.) Compazine and Phenergrin, which contain Phenothiazines, is in the Accudose in injectable form. (Id., pp. 17-19.) Ms. Thompson spoke to Ayers and told him that Weinerth did not have access to the Accudose, that Compazine was not a controlled substance, and she

stated that she did not know whether it could be mixed with a drink such as wine when she asked the question by Ayers.  (Id., pp. 20-21.)  Ms. Thompson noticed shortly after Victim was hired that Victim had a tremor.  (Id., p. 25.)  Ms. Thompson stated that Weinerth was "flirtatious and a little bit handsy," with her personally.  (Id., pp. 37, 39, 42.)

## III.

All four counts require the absence of probable cause to arrest, and the existence of probable cause precludes all four counts.  Whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern.  Brown, 608 F.3d at 735; Skop, 485 F.3d at 1137-38; Crosby v. Monroe County, 394 F.3d 1328, 1333 (11th Cir. 2004).

Weinerth was charged with sexual battery in violation of Fla. Stat. § 794.011(4)(d), which provides:

> (4) A person who commits sexual battery upon a person 12 years of age or older without that person's consent, under any of the following circumstances, commits a felony of the first degree,
> . . .
>
> (d) When the offender, without the prior knowledge or consent of the victim, administers or has knowledge of someone else administering to the victim any narcotic, anesthetic, or other intoxicating substance which mentally or physically incapacitates the victim.

Fla. Stat. § 794.011(4)(d).  Florida law also punishes sexual battery upon a person twelve years of age or older without the

person's consent when the victim is physically incapacitated.  Fla. Stat. § 794.011(4)(f).  "Sexual battery means oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object; however, sexual battery does not include an act done for a bona fide medical purpose."  Fla. Stat. § 794.011(1)(h).

At the very least, giving plaintiff the benefit of each and every factual issue, Detective Ayers knew the following at the time he applied for an arrest warrant and arrested plaintiff:

1.   The victim had reported to the local hospital and reported a sexual battery by a person known to her;

2.   The victim identified the date of the battery and gave a fairly detailed description of the events occurring on that date;

3.   The victim described conduct which clearly constituted sexual battery under Florida law;

4.   The victim provided a reasonable basis to believe she had been given some type of drug without her permission or consent and that the sexual battery occurred while she was incapacitated;

5.   A comprehensive drug screen of the victim's blood found Phenothiazines in her system, and the victim's reported medication did not contain such substances;

6.   The victim had a telephone conversation with plaintiff in which Detective Ayers heard plaintiff acknowledge he heard the victim say "no" about having sex and acknowledge that the incident was forced;

7.   Plaintiff gave a pre-arrest interview to Detective Ayers in which he appeared at the police station with a bag containing drugs from the hospital, which plaintiff said he kept in his possession at all times and took home.   Plaintiff admitted the sexual contact with the victim, but denied it was forced. Plaintiff also admitted making the telephone statements in which he acknowledged the sex was against the victim's will, but stated his statements were not true[3];

8.   Both plaintiff and the nursing director stated that plaintiff had access to drugs in the hospital, and that the medications were not strictly kept by the hospital; and

9.   On November 15, 2005, plaintiff broke his contract with the hospital and fled the area.[4]

---

[3]This is substantive evidence of plaintiff's guilt, either as an admission of guilt or as a false exculpatory statement, <u>United States v. Alejandro</u>, 118 F.3d 1518, 1521 (11th Cir. 1997); <u>United States v. McDowell</u>, 250 F.3d 1354, 1367 (11th Cir. 2001).

[4]Flight of an accused is competent evidence tending to establish guilt. <u>United States v. Borders</u>, 693 F.2d 1318, 1324-28 (11th Cir. 1982); <u>Blanding</u>, 446 So. 2d at 1137.

The Court finds that defendant Ayers had probable cause to arrest plaintiff for sexual battery.

Plaintiff points to facts which would suggest either that he did not commit sexual battery or that the case was not strong. Plaintiff argues that (1) Ayers investigated the facts for 11 days before seeking a warrant, and learned that the victim's underwear was not ripped, and that the victim had no evident sign of physical trauma 3 days after the sexual battery when examined. (Doc. #54, p. 19.) Weinerth also argues that a reasonable officer could not conclude that Weinerth administered a drug to the victim because (1) the victim did not disclose to the treating physician at Fawsett Memorial Hospital that she was taking two prescribed medications while voluntarily consuming alcohol; (2) the victim disclosed that she took Klonopin for tremors, but later claimed that the tremors were a result of the sexual battery; (3) the victim did not disclose that she took Compazine, but claimed that she was allergic to it, but had no reaction to it at any time after the sexual battery; and (4) because phenothiazine was the only other medication in her system, the victim claimed she was drugged with Compazine rendering her unable to consent. (Id., pp. 19-20.) Plaintiff argues that Ayers learned that only nurses have access to Compazine.

Ayers obtained the victim's medical records from her during the November 6, 2005 visit to Fawsett Memorial Hospital. (Doc. #20, ¶ 29.) The medical records revealed that the victim's current

medications included Pindolol, Klonopin, and Prevacid, and that she had a history of tremors. (Doc. #54-11, Exh. E.) Ayers also obtained the victim's medical records from a November 8, 2005, visit to her own physician. (Doc. #20, ¶ 36.) Ayers was aware that Victim reported that she was allergic to Compazine and that she suffered from chronic "familial" tremors. (Id., ¶ 38.) Ayers was also aware that the victim discontinued the following medication on November 8, 2005: Flexeril, Ultram, Vicodin, and Vicoprofen. (Id., ¶ 39.) Ayers reviewed these records prior to completing the Affidavit, and did not include in the Affidavit that the victim was allergic to Compazine, or that the victim admitted to taking two prescription controlled substances. (Id., ¶¶ 42, 44.) The lab test revealed the presence of benzodiazepines, phenothiazines, Tramadol, and metabolites in the victim's comprehensive urine drug screen. (Doc. #54-11, Exh. E.) Ayers also did not disclose that Victim's underwear was not torn, or that Weinerth's statements were completely inaudible in the controlled call. (Doc. #20, ¶¶ 48, 50.)

Ayers took contemporaneous notes while listening to the entire conversation on the controlled call even though the recording malfunctioned and failed to pick up Weinerth's part of the conversation, and therefore Ayers represents that he was truthful and accurate to Judge Bell. (Doc. #46-1, Exh. A, ¶ 11.) The Offense Report, dated November 29, 2005, reflects the malfunction, and that Ayers was able to hear both sides of the conversation.

(Doc. #46-1, Exh. 1, p. 19.)  Ayers did not include in the arrest Affidavit that the underwear was not torn because Victim did not advise that it was torn, only that she "heard them rip."  (Id., ¶ 12.)  The omission of these facts were not essential to a finding of probable cause and their inclusion would not negate the probable cause set forth in the arrest Affidavit.

The Offense Report provides that the victim provided prescriptions that accounted for the benzodiazepines, and Tramadol/Metabolites.  The victim advised Ayers that she had never taken anything containing phenothiazines.  (Doc. #46-1, Exh. 1, p. 21.)  The arrest Affidavit also provides that  the victim was not taking any medications containing phenothiazines because it would interfere with her blood pressure medication.  (Doc. #54-1, p. 2.) Ms. Thompson swore, at the time of her voluntary statement and prior to the arrest Affidavit, that phenothiazine was commonly found in Compazine or Phenergrin, and that the medications were easily accessible to both Weinerth and Victim.  (Doc. #46-2, Exh. 6.)  The Court finds that the omission of these facts would have no bearing on a finding of probable cause by a reasonable officer with knowledge of the facts and circumstances available to Ayers at the time of the arrest.  Ms. Thompson did not provide testimony that the medications had limited accessibility until after the issuance of the warrant.

The Court finds no Fourth Amendment violation occurred, and therefore the claims of false arrest and malicious prosecution must

fail.   The motion for summary judgment will be granted on all counts.

Accordingly, it is now

**ORDERED**:

1.   Detective Harvey Ayers' Dispositive Motion for Summary Judgment (Doc. #46) is **GRANTED** and the Second Amended Complaint is dismissed with prejudice as to all claims.

2.   The Clerk shall enter judgment in favor of defendant and against plaintiff accordingly, terminate all pending deadlines, and close the file.

3.   The parties' Joint Motion to Continue Trial and Joint Consent to Magistrate Judge's Jurisdiction (Doc. #57) is **DENIED** as moot and the Final Pretrial Conference is **cancelled.**

**DONE AND ORDERED** at Fort Myers, Florida, this ___7th___ day of February, 2012.

JOHN E. STEELE
United States District Judge

Copies:
Counsel of record